UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JAMES JOSEPH ROBERTS,

    Plaintiff,

v.                                                                      Case No: 8:16-cv-2132-T-JSS

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

## **ORDER**

Plaintiff, James Joseph Roberts, seeks judicial review of the denial of his claim for disability insurance benefits. As the Administrative Law Judge's ("ALJ") decision was based on substantial evidence and employed proper legal standards, the decision is affirmed.

## **BACKGROUND**

### **A.    Procedural Background**

Plaintiff filed an application for disability insurance benefits on July 10, 2013. (Tr. 168–69.) The Commissioner denied Plaintiff's claims both initially and upon reconsideration. (Tr. 94–97, 104–09.) Plaintiff then requested an administrative hearing. (Tr. 110–11.) Upon Plaintiff's request, the ALJ held a hearing at which Plaintiff appeared and testified. (Tr. 29–69.) Following the hearing, the ALJ issued an unfavorable decision finding Plaintiff not disabled and accordingly denied Plaintiff's claims for benefits. (Tr. 13–28.) Subsequently, Plaintiff requested review from the Appeals Council, which the Appeals Council denied. (Tr. 1–7.) Plaintiff then timely filed a complaint with this Court. (Dkt. 1.) The case is now ripe for review under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

### B.      Factual Background and the ALJ's Decision

Plaintiff, who was born in 1950, claimed disability beginning on October 17, 2008. (Tr. 34, 70.) Plaintiff has a college degree and additional certification as a teacher in the state of Missouri. (Tr. 35.) Plaintiff alleged disability due to hypothyroidism, high blood pressure, and metastatic, advanced, stage III prostate cancer. (Tr. 70.)

In rendering the decision, the ALJ concluded that Plaintiff did not perform substantial gainful activity between October 17, 2008, the alleged onset date, and December 31, 2012, the date Plaintiff was last insured. (Tr. 18.) After conducting a hearing and reviewing the evidence of record, the ALJ determined that Plaintiff had the following severe impairments: hypothyroidism, obesity, and a history of prostate cancer, including a history of prostatectomy and a recent recurrence termed "micrometastasis," which necessitated radiation and hormone therapy. (Tr. 18.) Notwithstanding the noted impairments, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"). (Tr. 18–19.) The ALJ then concluded that Plaintiff retained the following residual functional capacity ("RFC"):

> to perform sedentary work . . . except he requires a sit/stand option allowing the claimant to change positions every 30 to 60 minutes, while still achieving the requisite amount of sitting and standing for the sedentary exertional category. He can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs and occasionally balance, stoop, kneel, crouch, and crawl. Finally, the claimant must avoid concentrated exposure to excessive vibrations, and avoid all exposure to hazardous machinery and unprotected heights.

(Tr. 19.) In formulating Plaintiff's RFC, the ALJ considered Plaintiff's subjective complaints and determined that, although the evidence established the presence of underlying impairments that reasonably could be expected to produce the symptoms alleged, Plaintiff's statements as to the intensity, persistence, and limiting effects of his symptoms were not fully credible. (Tr. 20.)

The ALJ concluded that Plaintiff is capable of performing his past relevant work as a consultant, regional manager, vice president, and "public relations." (Tr. 23.) Accordingly, the ALJ found Plaintiff not disabled. (Tr. 24.)

**APPLICABLE STANDARDS**

To be entitled to benefits, a claimant must be disabled, meaning that the claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Social Security Administration, in order to regularize the adjudicative process, promulgated the detailed regulations currently in effect. These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled. 20 C.F.R. § 416.920. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. § 416.920(a). Under this process, the ALJ must determine, in sequence, the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment, i.e., one that significantly limits the ability to perform work-related functions; (3) whether the severe impairment meets or equals the medical criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1; and, (4) whether the claimant can perform his or her past relevant work. If the claimant cannot perform the tasks required of his or her prior work, step five of the evaluation requires the ALJ to decide if the claimant can do other work in the national economy in view of the claimant's age, education, and work experience. 20 C.F.R. § 416.920(a).

A claimant is entitled to benefits only if unable to perform other work. *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); 20 C.F.R. § 416.920(g).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards. *See* 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

In reviewing the Commissioner's decision, the court may not decide the facts anew, re-weigh the evidence, or substitute its own judgment for that of the ALJ, even if it finds that the evidence preponderates against the ALJ's decision. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's failure to apply the correct law, or to give the reviewing court sufficient reasoning for determining that he or she has conducted the proper legal analysis, mandates reversal. *Keeton*, 21 F.3d at 1066. The scope of review is thus limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

## ANALYSIS

Plaintiff challenges the ALJ's decision on the following grounds: (1) the ALJ failed to articulate good cause for not crediting the opinions of two treating physicians; and (2) the Appeals

Council failed to remand this matter for consideration of whether Plaintiff's condition meets or equals Listing 13.27. For the reasons that follow, these contentions do not warrant reversal.

### A. Opinions of Treating Physicians

Plaintiff argues that the ALJ erred by not crediting the opinions of treating physicians Dr. Robert Oppenheimer and Dr. Robert Carey. (Dkt. 16 at 7–9.) In response, Defendant argues that the ALJ articulated good cause for according little weight to these opinions and that this decision is supported by substantial evidence. (Dkt. 17 at 5.)

On September 26, 2013, Dr. Oppenheimer completed a medical source statement. (Tr. 325–26.) During an eight-hour workday, Dr. Oppenheimer found Plaintiff capable of sitting for three hours, standing or walking for two hours, and resting in a reclining or lying position for three hours. (Tr. 325.) With regard to his opinion that Plaintiff would require three hours of rest in an eight-hour workday, Dr. Oppenheimer explained that this was due to Plaintiff's "fatigue from treatment for prostate cancer and poor sleep." (Tr. 325.) Further, Dr. Oppenheimer found that Plaintiff is either rarely capable or incapable of (1) lifting and carrying as little as one to five pounds "due to urinary incontinence," (2) balancing, or (3) stooping. (Tr. 326.) He diagnosed Plaintiff with recurrent prostate cancer, hyperthyroidism, and sleep apnea. (Tr. 326.)

On November 4, 2013, Dr. Carey completed the same medical source statement form that Dr. Oppenheimer completed. (Tr. 329–30.) Like Dr. Oppenheimer, Dr. Carey found Plaintiff capable, in an eight-hour workday, of sitting for three hours, standing or walking for two hours, and resting in a reclining or lying position for three hours. (Tr. 329.) Dr. Carey explained that Plaintiff required rest to relieve pain and fatigue from his metastatic prostate cancer. (Tr. 329.) Dr. Carey found Plaintiff capable of occasionally, meaning less than one third of an eight-hour workday, (1) lifting and carrying one to five pounds, (2) balancing, and (3) stooping. (Tr. 330.)

He diagnosed Plaintiff with "metastatic prostate cancer on androgen deprivation," which causes pain, fatigue, muscle mass loss, and a decrease in bone density. (Tr. 330.)

The ALJ gave little weight to the opinions of Dr. Oppenheimer and Dr. Carey. (Tr. 23.) First, the ALJ did not credit Dr. Oppenheimer's opinion that Plaintiff would be unable to lift any weight due to urinary incontinence because neither Dr. Oppenheimer's nor Dr. Carey's records "confirm[ed] any real problems with urinary incontinence (let alone, dating back to October 2008)." (Tr. 23.) Further, the ALJ found that Dr. Oppenheimer's opinion that Plaintiff is rarely able or totally unable to balance or stoop was not corroborated by supporting medical evidence. (Tr. 23.) As to Dr. Carey's opinion, while the ALJ found Dr. Carey's opinion that Plaintiff can lift up to five pounds "more reasonable," he nonetheless found this opinion uncorroborated by medical evidence "show[ing] anything in terms of upper extremity strength deficits or the like." (Tr. 23.)

In support of his argument that the ALJ improperly discredited this opinion evidence, Plaintiff summarizes his medical history of prostate cancer, arguing that by March 2013, *after* his date last insured, his PSA levels[1] had "tripled" and that Dr. Carey diagnosed Plaintiff with micrometastatic disease in March 2015. (Dkt. 16 at 8.) This evidence, however, is not during the time period Plaintiff was insured. Further, Dr. Carey's diagnosis (Tr. 444) was not made until after the ALJ issued his decision. To be eligible for disability insurance benefits, Plaintiff must demonstrate that he was disabled "on or before" the last date on which he was last insured, *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing 42 U.S.C. § 423(a)(1)(A)), which was December 31, 2012. (Tr. 18.) Therefore, Plaintiff's argument that the ALJ erred in his evaluation

---

[1] As explained in the ALJ's decision, "PSA" stands for the prostate-specific antigen (Tr. 20), which is monitored through blood tests. (Dkt. 17 at 5, n.4.)

of the opinion evidence based on evidence of Plaintiff's cancer from after Plaintiff's date last insured is inapposite.

The Court's review is limited to whether the ALJ articulated good cause for discounting Dr. Oppenheimer's and Dr. Carey's opinions. Medical opinions of treating physicians must be given substantial or considerable weight unless good cause is shown to the contrary. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c)(2). Good cause exists when the physician's is not bolstered by the evidence, the evidence supported a contrary finding, or the physician's opinion is conclusory or inconsistent with his or her own medical records. *Winschel*, 631 F.3d at 1179. Here, the ALJ explained that his reason for according Dr. Oppenheimer's and Dr. Carey's opinions little weight was that they were not supported by their own treatment notes. This is an appropriate articulation of good cause. *See Crawford*, 363 F.3d at 1159.

Upon review of the evidence, the ALJ's decision to accord these opinions little weight is supported by substantial evidence. The ALJ thoroughly summarized Plaintiff's treatment with Dr. Carey and Dr. Oppenheimer. (Tr. 20–21.) Specifically, after Plaintiff's prostate was removed in 2008, the ALJ noted that, beginning in summer and early fall of 2011, Plaintiff's "post-operative prostate-specific antigen" ("PSA") levels began to rise incrementally. (Tr. 20.) In October 2012 treatment notes, Dr. Carey explained that post-surgery, Plaintiff's PSA levels "went to an undetectable level," but then became measurable again. (Tr. 266.) Dr. Carey therefore referred Plaintiff to Dr. Stephen Patrice to undergo adjuvant radiation therapy between April and June 2012. (Tr. 266.) In Dr. Patrice's treatment notes (Tr. 245–53), Dr. Patrice discussed with Plaintiff that the radiation therapy "only has the potential to be curative if the disease was truly confined to the prostate bed," which he did not know with "absolute certainty." (Tr. 247.) Dr. Patrice

concluded that "since there is no clear evidence of gross metastatic disease," he felt it was reasonable to recommend radiation therapy. (Tr. 247.) In a post-radiation therapy follow-up appointment in October 2012, Dr. Patrice found that Plaintiff's PSA levels were stable and there was "no evidence of progression of disease." (Tr. 252–53.) In his October 2012 follow-up visit with Dr. Carey, Dr. Carey noted that Plaintiff's PSA levels will continue to be monitored every six months and that "[h]is symptoms, fortunately, are good in that he is not having any leakage." (Tr. 266.) He noted that Plaintiff may need hormone therapy in the future and recommended that Plaintiff increase his muscle mass and bone density through exercise and weight loss. (Tr. 266.) During these 2012 visits with Dr. Patrice and Dr. Carey, Plaintiff reported good urinary control. (Tr. 250, 252, 266, 268, 270, 272, 276, 278, 279, 282, 284.)

Dr. Oppenheimer treated Plaintiff's hypothyroidism and other conditions. In September 2011, Dr. Oppenheimer examined Plaintiff for a yearly preventative evaluation. (Tr. 353.) Plaintiff reported feeling well with "[n]o major complaints." (Tr. 353.) In a follow-up visit in November 2011, Dr. Oppenheimer reported that Plaintiff's "active problems," in relevant part, were as follows: hypertension, which was benign, hyperlipidemia, hypothyroidism, being overweight, prostate cancer, and sleep apnea. (Tr. 350.) His thyroid condition improved with medication. (Tr. 350.) In February 2012, Dr. Oppenheimer reported that Plaintiff tolerated his thyroid medication well and that his deficiencies were "adequately replaced." (Tr. 347–48.) Dr. Oppenheimer discussed Plaintiff's rising PSA level and discussed that Plaintiff should follow up with Dr. Carey. (Tr. 347–48.) In September 2012, Dr. Oppenheimer examined Plaintiff and recommended continuing his medications as prescribed and his exercise and diet program. (Tr. 342–45.)

The ALJ found that Dr. Oppenheimer's treatment notes showed that Plaintiff did not report complaints or side effects from medication. (Tr. 20.) Further, Plaintiff did not report pain or fatigue symptoms in these visits to Dr. Oppenheimer, and Plaintiff's impairments of hypertension and hyperlipidemia were adequately controlled. (Tr. 20, 22.) Thus, the ALJ found that the medical evidence did not support Plaintiff's complaints of pain, fatigue, poor sleep, hot flashes, and urinary frequency, and that Plaintiff's impairments of hypertension and hyperlipidemia did not warrant a more restrictive RFC. (Tr. 20, 22). However, the ALJ recognized that Dr. Oppenheimer and Dr. Carey noted Plaintiff's rising PSA levels by spring of 2012. (Tr. 21.) The ALJ cited Dr. Carey's April 2012 treatment note in which Dr. Carey found that results of a March 2012 magnetic resonance imaging (MRI) exam showed "no evidence of a suspicion of metastasis." (Tr. 21, 274.) Specifically, the March 2012 MRI showed no evidence of "osseous metastatic disease." (Tr. 310.) Further, treatment notes in 2012 showed that Plaintiff maintained good urinary control. (Tr. 21.) Thus, the ALJ concluded that "while there may have been some initial alarm for bony metastasis, the MRI ruled this out. Likewise, and while there may have been incremental increases in his PSA, the claimant exhibited few symptoms. In particular, he exhibited few symptoms that would cause deficits in the ability to perform basic work activities." (Tr. 21.)

Therefore, the ALJ's decision to accord little weight to Dr. Oppenheimer's opinion because his treatment records did not show urinary incontinence or evidence of Plaintiff's inability to balance or stoop (Tr. 23), is supported by substantial evidence. The ALJ's decision to accord Dr. Carey's opinion that Plaintiff can lift only up to five pounds little weight because it is uncorroborated by evidence of upper body strength deficits (Tr. 23), is likewise supported by substantial evidence. Accordingly, Plaintiff's first contention does not warrant reversal.

### B. Appeals Council

Next, Plaintiff argues that the Appeals Council erred by not remanding the case for evaluation of a letter written by Dr. Carey in March 2015. (Dkt. 16 at 9.) On March 30, 2015, Dr. Carey wrote a letter in response to a letter from Plaintiff's counsel. (Tr. 444.) In his letter, Dr. Carey states that the primary site of Plaintiff's cancer was his prostate, which was removed in 2008. (Tr. 444.) At the time of the letter, Plaintiff "ha[d] an elevated PSA, which means that he has micrometastatic disease given that his metastatic evaluation with imaging was unable to locate where his cancer is present now. It is presumably in his bones or lymph node tissue, most commonly." (Tr. 444.) Further, Dr. Carey explained that his prostate was removed in 2008 because it was believed that his cancer could be "locally curable," and that Plaintiff was treated with hormone therapy only "after it was obvious that he had distant micrometastatic disease." (Tr. 444.)

Plaintiff argues that Dr. Carey's March 2015 demonstrates that Plaintiff's condition met or equaled Listing 13.27 before his insured status expired. (Dkt. 16 at 10.) Listing 13.27 is the Listing for cancer in which the "[p]rimary site [is] unknown after appropriate search for primary," and includes "metastatic carcinoma or sarcoma, except for squamous cell carcinoma confined to the neck nodes." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 13.27. Therefore, Plaintiff argues that "the Appeals Council erred in failing to remand this case with instructions to obtain medical expert testimony to assess the applicability of Listing 13.27." (Dkt. 16 at 10.)

If a claimant presents evidence after the ALJ's decision, the Appeals Council must consider it if it is new, material, and chronologically relevant. *Beavers v. Soc. Sec. Admin., Comm'r*, 601 F. App'x 818, 821 (11th Cir. 2015); 20 C.F.R. § 404.970(b). New evidence must not be cumulative of other evidence in the record. *See Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986);

*Beavers*, 601 F. App'x at 823 (holding that the Appeals Council did not err in its review of new evidence because "[t]he new evidence is either cumulative of, or consistent with, the evidence that was before the ALJ"). The new evidence is material if "there is a reasonable possibility that the new evidence would change the administrative outcome." *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987). Chronologically relevant evidence is evidence that relates to the period on or before the date of the ALJ's hearing decision. *Flowers v. Comm'r of Soc. Sec.*, 441 F. App'x 735, 745 (11th Cir. 2011) (citing 20 C.F.R. § 404.970(b)). Evidence relating to a period after the date of the ALJ's hearing decision is irrelevant as review is limited to "the decision of the ALJ as to whether the claimant was entitled to benefits during a specific period of time, which period was necessarily prior to the date of the ALJ's decision." *Wilson v. Apfel*, 179 F.3d 1276, 1279 (11th Cir. 1999).

The Appeals Council must grant a petition for review if it finds that the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007) (internal quotations omitted). The Appeals Council is not required to provide a detailed explanation of a claimant's new evidence when it denies a petition for review. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 783–85 (11th Cir. 2014) (explaining that the Appeals Council, when denying a request for review, is not required "to give a detailed rationale for why each piece of new evidence submitted to it does not change the ALJ's decision"). As such, on appeal, a reviewing court "must consider whether the new evidence renders the denial of benefits erroneous." *Ingram*, 496 F.3d at 1262. In other words, to obtain a remand from a federal district court under sentence four of 42 U.S.C. § 405(g), "[a] claimant must show that, in light of the new evidence submitted to the Appeals Council, the ALJ's

decision to deny benefits is not supported by substantial evidence in the record as a whole." *Timmons v. Comm'r of Soc. Sec.*, 522 F. App'x 897, 902 (11th Cir. 2013).

In his request for the Appeals Council's review of the ALJ's decision, Plaintiff argued that Dr. Carey's March 2015 letter confirms that Plaintiff meets Listing 13.27. (Tr. 8.) The Appeals Council received and incorporated into the record Dr. Carey's March 2015 letter, which is part of Exhibit 15F. (Tr. 5, 444.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision, finding "no reason under our rules to review the Administrative Law Judge's decision." (Tr. 1.) Specifically, the Appeals Council considered whether the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record," but concluded that the new evidence "does not provide a basis for changing the Administrative Law Judge's decision." (Tr. 2.)

In support of his argument, Plaintiff cites Dr. Patrice's treatment notes from 2012. (Dkt. 16 at 11.) In March 2012, Dr. Patrice examined Plaintiff on referral from Dr. Carey due to Plaintiff's rising PSA levels after his 2008 surgery removing his prostate. (Tr. 245.) Dr. Patrice diagnosed Plaintiff with recurrent adenocarcinoma of the prostate. (Tr. 245.) However, Dr. Patrice discussed with Plaintiff that they could not know "with certainty" if his cancer recurrence was only in his prostate. (Tr. 249.) Dr. Patrice informed Plaintiff that it was "possible that he has micrometastatic disease." (Tr. 249.) Radiation therapy, Dr. Patrice explained, would only be effective if his cancer was only in his prostate. (Tr. 249.) Dr. Patrice elaborated as follows:

> The fact that it was approximately 36 months from the time of the surgery to the detection of PSA, is a favorable prognostic factor for a local recurrence. We do not, however, have a large number of data points to determine his PSA kinetics. He also had negative lymph nodes, negative seminal vesicles, and a close margin of resection which would also provide evidence and support that this is a localized recurrence.

(Tr. 249.)

In a follow-up appointment with Dr. Patrice in April 2012, Dr. Patrice noted that Plaintiff had an MRI performed on March 28, 2012, "which showed no evidence of any metastatic disease." (Tr. 247, 310.) Dr. Patrice again informed Plaintiff that radiation therapy would only be effective if Plaintiff's cancer was confined to his prostate, which could not be known with "absolute certainty." (Tr. 247.) However, Dr. Patrice concluded that "since there is no clear evidence of gross metastatic disease," it was reasonable to offer Plaintiff radiation therapy. (Tr. 247.) Because Plaintiff was scheduled to have his PSA levels checked again, Dr. Patrice and Plaintiff agreed to await those results before beginning radiation therapy. (Tr. 247–48.) Plaintiff received radiation therapy, which ended in June 2012. (Tr. 250.) July 2012 blood tests showed that Plaintiff's PSA level rose again, and Dr. Patrice stated that his and Dr. Carey's treatment plan was to again test Plaintiff's PSA level in September 2012. (Tr. 251.) Dr. Patrice discussed with Plaintiff additional treatment options should the PSA level continue to rise, which would indicate "the presence of micrometastatic disease." (Tr. 251.) In an October 2012 follow-up examination by Dr. Patrice, Dr. Patrice noted that the results of Plaintiff's September 2012 PSA testing showed that his level was "stable at this time." (Tr. 252.) Therefore, there was "no evidence of progression of [his] disease," although Plaintiff would continue to be monitored by Dr. Carey. (Tr. 252–53.)

Dr. Carey's treatment notes align with Dr. Patrice's treatment notes. First, reviewing Plaintiff's March 2012 MRI, Dr. Carey noted that the MRI "shows no evidence of metastatic disease." (Tr. 274.) In July 2012 and October 2012 treatment notes, Dr. Carey noted that Plaintiff underwent radiation therapy with Dr. Patrice between April and June 2012 and, as of July 2012, "[t]he metastatic evaluation has been negative as would be expected with such a low PSA." (Tr. 266, 270.) Dr. Carey noted that Plaintiff's PSA level will continue to be monitored and that he informed Plaintiff may need to undergo hormone therapy in the future. (Tr. 266.) After his date

last insured, by March 2013, Dr. Carey noted that Plaintiff's PSA level doubled in less than six months and Plaintiff "has what is likely micrometastatic disease." (Tr. 262.) Therefore, Dr. Carey recommended that Plaintiff consider undergoing hormone therapy. (Tr. 262.)

Plaintiff argues that the evidence shows that Plaintiff's diagnosis of micrometastatic cancer was suspected during the time Plaintiff was insured but not confirmed until after his radiation therapy was proven ineffective. (Dkt. 16 at 12.) A review of the evidence before Plaintiff's last date insured shows that Dr. Patrice and Dr. Carey, in evaluating the cause of Plaintiff's rising PSA level, considered whether Plaintiff's cancer was recurring in his prostate, in which case radiation therapy could be used to treat it, or if the location was unknown, in which case hormone therapy would be used to treat it. In his 2012 treatment notes, Dr. Patrice makes plain that there was no way to know with certainty that Plaintiff's cancer was restricted to his prostate and that he did not have micrometastatic disease. However, Dr. Patrice's review of a March 2012 MRI of Plaintiff did not show clear evidence of micrometastatic disease and thus he recommended radiation therapy as a reasonable course of treatment. After Plaintiff's PSA level was still on the rise after his radiation therapy concluded in June 2012, Dr. Patrice discussed Plaintiff's other treatment options because his rising PSA level was indicative of micrometastatic disease. Although September 2012 PSA testing showed that Plaintiff's level had stabilized, by March 2013, Plaintiff's PSA level rose again and Dr. Carey diagnosed Plaintiff with micrometastatic disease.

Dr. Carey's May 2015 letter is not "new," noncumulative evidence. The record contains Dr. Carey's March 2013 finding, in his treatment records, that Plaintiff "has what is likely micrometastatic disease." (Tr. 262.) Thus, Dr. Carey's May 2015 letter confirming a diagnosis he made in March 2013 does not constitute new evidence. The letter is, however, chronologically relevant. This is because Dr. Patrice and Dr. Carey contemplated, at length, the possibility of

Plaintiff having micrometastatic disease during the time Plaintiff was insured and during the time before the ALJ's decision was rendered. *See Caulder*, 791 F.2d at 877–78 (finding evidence submitted to the Appeals Council "relevant and probative in that it pertains to a condition that [the claimant] listed in his applications at the administrative level as a source of his disability" and "contains a medical opinion on the presence of the impairment during the time period for which benefits are sought").

Importantly, however, this letter is not material because it does not render the ALJ's decision unsupported by substantial evidence. The ALJ concluded that "while there may have been some initial alarm for bony metastasis, the [March 2012] MRI ruled this out" and, "[a]t most, there was a deterioration in health towards the latter half of 2013, but this is also in dispute (and, most certainly occurs well *after* the date last insured)." (Tr. 21, 22.) Substantial evidence supports this conclusion and the May 2015 letter does not change that. The evidence during the time Plaintiff was insured shows that while Plaintiff's physicians considered whether he had micrometastatic disease during the time he was insured, they concluded that he likely had recurrent prostate cancer. Unfortunately, as the ALJ explained (Tr. 21), the evidence after Plaintiff's date last insured, beginning in March 2013, shows that Plaintiff's PSA levels began to rapidly rise and that Dr. Carey diagnosed Plaintiff with micrometastatic disease. (Tr. 262.) The addition of Dr. Carey's March 2015 letter (Tr. 444), in which he confirmed his March 2013 diagnosis of micrometastatic disease (Tr. 262), does not render the ALJ's conclusion that prior to the expiration of Plaintiff's insured status, Plaintiff did not have micrometastatic disease unsupported by substantial evidence. *See Timmons*, 522 F. App'x at 902 (explaining that "[a] claimant must show that, in light of the new evidence submitted to the Appeals Council, the ALJ's decision to deny

benefits is not supported by substantial evidence in the record as a whole"). Therefore, Plaintiff's second contention does not warrant reversal.

## CONCLUSION

Accordingly, after due consideration and for the foregoing reasons, it is

**ORDERED**:

1. The decision of the Commissioner is **AFFIRMED**.

2. The Clerk of Court is directed to enter final judgment in favor of the Commissioner and close the case.

**DONE** and **ORDERED** in Tampa, Florida, on August 17, 2017.

_____
JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record